UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAURA KAUFMAN<br><br>                 Plaintiff<br><br>        -against-<br><br>MELLISSA GLIATTA<br>THOR EQUITIES LLC, and<br>JOSEPH J. SITT<br><br><br><br>                Defendants. | Civil Action No**.:** 1:25-cv-2001 |

**COMPLAINT with JURY DEMAND AS TO SPECIFIED COUNTS**

This is a Complaint for fraudulent inducement, breach of contract, and breach of the implied covenant of good faith and fair dealing.. Punitive damages are also sought under New York and/or Connecticut law as applicable. The complaint arises from the bad faith attempt by the defendants to induce the plaintiff into a position as a senior executive and then into a "separation," without disclosing that they had no intention of paying the $400,000 *guaranteed* bonus that had been a core condition of her employment, under contracts they drafted.

**Jurisdiction**

This court has subject matter jurisdiction under 28 U.S.C. §1332 because the plaintiff and the defendants are domiciled in different states and the amount in controversy exceeds $75,000.

**Parties**

1) Plaintiff Laura Kaufman ("Kaufman") is a Connecticut resident and domiciliary. Kaufman is an experienced real estate executive with extensive experience developing and managing real estate for the life sciences industry and other types of real estate assets.

2) Defendant Melissa Gliatta is the Chief Operating Officer of defendant Thor Equities LLC ("Thor"). Gliatta is a South Carolina resident and domicile.

3) Gliatta had been with Thor for more than two decades, has worked closely with defendant Sitt at Thor and in his preceding business, and made material representations to induce Kaufman to enter into the agreements cited below, with the full knowledge and consent of Sitt, and at his direction.

4) Defendant Thor is a Delaware Limited Liability Company based in New York with its principal offices located at 25 West 39th Street, New York, New York. Its two members, defendant Sitt and Betty Sitt, are New York residents and domiciliaries.

5) Defendant Joseph J. Sitt ("Joe Sitt") is the chairman of Thor. He resides in and is a domicile of the state of New York.

**Background**

6) On or about June 11, 2021 Thor engaged Kaufman as Executive Vice President of Thor Sciences, a division of Thor established to enable Thor to transact life sciences real estate acquisitions and engage in the development of such assets.

7) Until Kaufman was hired, Thor had little experience in the field. It had made a small number of acquisitions that were poorly underwritten and, with limited exceptions, were not performing well. Kaufman was previously Vice President of BioMed Realty, a highly respected real estate investment trust acquired in 2015 by Blackstone and previously traded on the New York Stock Exchange.

8) BioMed was and continues to be a global leader in life sciences real estate. As Vice President of BioMed, Kaufman managed and developed over $1 billion of its life sciences real estate portfolio, one of the company's largest. Kaufman left BioMed when she successfully sold all of the assets within her purview. Prior to the BioMed position, Kaufman had been with Lyme Properties, a pioneering founder of the life sciences real estate industry.

9) Thor, through Gliatta, approached Kaufman in 2021 based on her reputation. In the ensuing months, Kaufman engaged in extensive discussions with Gliatta about potentially joining the company.

10) During those hours of discussions, Gliatta made numerous representations to Kaufman, one of the more material being that Thor had a $500,000,000 commitment from a Danish Pension Fund, PFA, for investment in life sciences real estate. She also represented that Thor had significant company equity sufficient to fund a major life sciences program if needed, as well as excellent relationships with other capital sources.

11) Kaufman questioned Gliatta extensively about that commitment as well as the claimed relationships and assets. From her extensive experience, she was aware of the risks of a company that lacked equity to participate in the large acquisitions typical of the industry as well as the competition for available assets. Further, capital was essential to undertaking the development and acquisitions that would form the basis of a significant portion of Kaufman's compensation, as discussed below, in the form of "promote" income.

12) Kaufman emphasized to Gliatta that she was not willing to join a company that lacked assured equity, and was encouraged by Sitt's claim to be a multi-billionaire, and that he could independently fund acquisitions if needed.

13) On numerous occasions, Gliatta assured Kaufman that, apart from the Danish commitment, Thor had extensive, long-term relationships with major investors and equity providers, including Harrison Street and Morgan Stanley, so that if more equity were needed for projects or acquisitions, it was readily accessible. She said that "the sky is the limit" in terms of Thor's ability to obtain capital.

14) The latter relationships were purportedly based on Thor's work in office, retail, industrial and other real estate fields, though Thor had little experience with the complex and unique operating needs of life sciences tenants which was, the company made clear, why they needed someone like Kaufman.

15) Such relationships are pivotal to success in the field because when acquisition or development opportunities arise, other companies compete for them and sellers require assurances of ability to close on a deal. Kaufman had extensive experience with their unique needs -- expertise that Thor badly needed.

16) Contrary to what she was told, and unknown to Kaufman (and not disclosed by anyone at Thor, including Sitt), Thor's relationships in the investor community were tenuous due to multiple and substantial foreclosures on Thor properties.

17) Also unknown to Kaufman -- and a serious impediment to accurate underwriting of potential deals -- Thor had a history of failing to pay numerous contractors and consultants (architects, engineers, consulting advisers) who are indispensable to successful underwriting and investment.

18) Sitt was the person responsible for those refusals to pay vendors, a problem that later seriously impeded Kaufman's work and created reputational hazards when those services were needed for underwriting.

4

19) Not knowing these material negative facts about Sitt and Thor, and after reaching an agreement in principle, Kaufman and Gliatta entered into negotiations for the Executive Vice President position.

20) The contract ("Agreement"), Appendix A, was drafted by Thor's attorneys under Thor's direction.

21) The initial $400,000 base salary and $400,000 guaranteed bonus were below market rates for a person of Kaufman's experience. Given the risk of foregoing other potential opportunities in a burgeoning market, a major negotiating issue was Kaufman's insistence that her bonus for the first year be guaranteed, with no contingencies of any sort.

22) Gliatta readily agreed to the guaranteed bonus ("Bonus"), which was incorporated into ¶4(b) of the Agreement. As the express terms indicate, performance was irrelevant to the guarantee.

23) ¶4(b) reads as follows: "The Company shall pay the Executive a performance bonus covering the period of the Start Date through the twelve (12) month anniversary of the Start Date, of no less than $400,000.00 (the "Guaranteed First Year Bonus"), payable within fifteen (15) days after such date, and provided that the Executive is "Actively Employed" by the Company on such payment date."

24) Further negotiations ensued during which Kaufman insisted that the Bonus be paid even in the event of termination, so long as the termination was not for cause (defined in ¶6(d)). That assurance was embedded into the Agreement as ¶6(b), which committed Thor to payment under such circumstances.

*25)* To allow Kaufman to earn market competitive compensation above the base salary and guaranteed bonus, Kaufman was given an interest in the profit of individual projects.

That interest, known as a "promote," was expected to add an additional $750,000-$1,500,000 to Kaufman's compensation. The provision for that additional compensation, common in real estate for senior executives, was placed in ¶4(c) and Annex A to the Agreement. The promote ("Promote") was meant to be the performance related portion of compensation, as the guaranteed bonus was unrelated to performance and a fixed commitment, particularly because the likelihood of Promote compensation in the first year was very limited because it was based on future performance of the assets.

26) The Agreement was drafted and signed by Thor in New York and signed by Kaufman in Connecticut.

27) The Agreement was executed on June 11, 2021.

### Kaufman Sources over $2 Billion in Lucrative Investments

28) Based on her extensive experience and contacts in the field of life sciences, Kaufman was able to quickly identify a broad array of projects for Thor to acquire or develop.

29) The underwriting for each project was highly favorable based on the rates of return sought by Thor.

30) Within the first year, Kaufman identified and sourced projects with a value of over $2,000,000,000. Depending on profit levels under the Promote, execution on those opportunities would have provided Kaufman with millions of dollars in Promote compensation. The underwriting indicated that all of them would provide such compensation.

31) Unfortunately, after arriving at Thor, Gliatta disclosed to Kaufman that the programmatic agreement with PFA was not yet completed, though she claimed it would be finalized shortly. As it turned out, PFA never finalized its commitment for the $500,000,000

investment, so Thor needed to find individual entities to invest in the more than a dozen projects sourced by Kaufman, or provide the equity from its claimed deep resources and/or Sitt's wealth.

32) The absence of the PFA commitment meant that a material condition of Kaufman's willingness to come to Thor was absent.

33) To assuage her concern, Thor advised Kaufman that if other individual investors could not be found, it had over $1 billion on its balance sheet that could be made available so, as directed by Gliatta and Sitt, Kaufman continued to look for attractive projects. As Sitt stated repeatedly, "bring me deals," and Kaufman did.

34) Thor's lack of available equity, and Sitt's refusal to use Thor's alleged $1 billion in equity or his considerable personal assets, proved to be highly problematic and ultimately defeated Kaufman's success in closing attractive prospective properties. That lack of equity also meant that the Promote that was meant to bridge the market compensation gap was imperiled.

35) Numerous investments could not therefore be consummated and Thor's inability to provide proof of equity to sellers became a serious barrier that dissuaded sellers from doing business with the company, and impeded its credibility as a buyer in the life sciences market.

36) A particularly embarrassing – and representative -- incident arose when Kaufman learned that BioMed, her previous employer with which she had excellent continuing relations, was looking to sell a large, attractive portfolio of assets in the San Diego market. Acquisition of those assets would put Thor on the map in the industry, be lucrative, and generate Promote compensation for Kaufman.

37) Kaufman arranged a conference call with Biomed, which took place during her vacation. Sitt and another Thor executive participated.

38) The call was an embarrassment for Kaufman, given her long term relationship with the company and its executives. During the call, Sitt was unprepared, unfocused, rambled and spoke in unresponsive generalities and cliches about how he liked to "do deals." He was vague about available capital or equity contribution – the key interest for a seller like BioMed. The assets were attractive to a number of Thor competitors so available capital was a major factor.

39) Sitt was vague because he knew (but did not disclose) he would not commit Thor capital and had no commitments from others, so he failed to provide specifics about how he could finance Thor's bid, and failed to respond to direct questions posed by BioMed. The purpose of the call was for BioMed to be able to perceive Thor as a viable and qualified investor. Sitt's opacity produced a failure and an embarrassment.

40) Despite Kaufman's underwriting that showed that the acquisition would be profitable at a higher price than Thor was willing to bid, Thor put in a "tank the deal" (Sitt's words) low offer and lost the property as a result. Kaufman's underwriting and recommended bid amount would have caused Thor to be selected as the buyer.

41) Thor lost the project when the higher bid, from an entity that showed authentic proof of funds, was accepted. The incident was embarrassing to Kaufman, given her previous senior position at BioMed. It also meant that BioMed would not look to Kaufman for future deals with Thor. Given that BioMed was a major player in the business, this was a major setback – all the result of the absence of available equity capital that had been the central concern of Kaufman's when she negotiated her position with Gliatta.

*42)* On information and belief, Thor knew it could not provide the needed equity. The low bid was expressly designed to torpedo Kaufman's effort while creating the appearance of

being a serious bidder. The low bid was meant to be face-saving for Thor, and to allow it to pretend that it believed that BioMed was over valuing its San Diego assets, rather than admit that Thor lacked capital for the purchase.

43) Further embarrassment occurred with a bid on a property in Pasadena, California, that Kaufman recommended and underwrote to Thor's profit requirements. Thor could not raise capital, and refused to provide its own or Sitt's personal resources. Sitt, it turned out, was a believer in risking "other peoples' money," not his own.

44) When Thor could not find a capital partner, Kaufm recommended that Thor pull out of the bidding. After a Thor investment meeting to discuss the deal, Kaufman was instructed to falsely claim to the seller that Thor had three capital partners. Kaufman refused to make false statements to the seller and had to find a pretext to withdraw from negotiations to save face for herself and Thor.

45) Problems with the other sourced, profitable projects persisted when Thor's relationships with investors, previously claimed by Gliatta to be strong, lacked credibility.

46) All of the sourced projects were, as Kaufman's underwriting had shown, attractive, evidence for which was that the large majority of them attracted other buyers.

47) When Kaufman spoke with a long-time contact, an executive with a major potential investor, he said his company would not work with Thor because of Sitt's reputation for "retrading" (a polite term for reneging on agreements in order to renegotiate them).

### Thor's Ruse to Avoid Paying the Guaranteed Bonus

48) On or about June 10, 2022, Gliatta spoke with Kaufman and said that unless she agreed to modification of the Agreement, that Thor would terminate her employment that day. Had the threat been carried out, it would have violated the 30 days' notice requirement in ¶6(a)

9

of the Agreement. Thor's disregard of that notice requirement was to later be repeated and become the failing that led to this case.

49) After amendments to the Agreement -- unilaterally imposed by Thor (in each case without proper notice) as a condition to Kaufman's continued employment -- first in June, 2022 and again in August, Gliatta repeated the evasive maneuver to dodge the notice requirement.

50) On December 5, 2022 she informed Kaufman, with Sitt's approval, that her employment was terminated (without cause) and that in order to receive the base compensation under Agreement ¶4(a) she would have to sign a Separation Agreement and Release ("Separation"), Appendix B. Under the August extension and amendment, Thor committed to pay the guaranteed bonus on December 31, 2022, and the Separation Agreement assured that it would be paid (¶11).

51) Under the Agreement, Kaufman had the right to her guaranteed bonus of $400,000 because Thor's termination gave less than 30 day's notice as required under 6(a) of the Agreement it drafted, and December 5 was only 26 days before the payment date of December 31.

52) The deficient notice meant that Kaufman was employed on the due date for payment of the bonus.

53) Further, ¶11 of the Separation provided that all covenants in the Agreement that were designated to survive termination under the Agreement, would continue in effect under the Separation. Agreement ¶6 was one of those surviving covenants.

54) The Agreement's covenant that the guaranteed bonus under its ¶6(b) therefore remained in full force and effect.

10

55) ¶13(b) of the Agreement provided that "no term of this Agreement may be waived except in writing except by writing signed by the Party waiving the benefit of such term."

56) Kaufman never waived any term of the agreement other than her consent in August to the bonus payment date of December 31.

57) Thor has never paid the guaranteed bonus.

**COUNT I: Fraudulent Inducement of the Agreement (Jury Trial Demanded)**

58) The allegations in ¶¶1-57 are repeated and realleged.

59) Gliatta, with the full knowledge, participation and consent of Sitt, induced Kaufman to enter into the Agreement by making false representations that PFA had agreed to provide a programmatic commitment for life science real estate investment in the amount of $500,000,000.

60) At the time that representation was made, Gliatta and Sitt knew that material representation was false.

61) Further, Gliatta, with the full knowledge and consent of Sitt, induced Kaufman with the further representation that Thor had excellent long-term relationships with major investment sources, including Morgan Stanley and Harrison Street, and that they would be able to provide additional equity and debt financing for life sciences real estate, for any investment not covered by PFA.

62) At the time she made that claim, Gliatta and Sitt knew that it was false.

63) Because of those false inducements, Kaufman refrained from seeking other positions that paid as well or more.

64) At the time of the Agreement, life sciences real estate was in a boom phase and opportunities for seasoned executives were abundant. As a former BioMed and Lyme executive, Kaufman's credentials were impeccable.

65) As a result, Kaufman was taken out of the life sciences market by Thor and lost profitable job opportunities as a result, to her substantial detriment.

66) Based on the false representations as to available equity, Kaufman reasonably assumed that the promote provision in the Agreement would be sufficient to make up the difference between the salary/bonus package and market value for her services.

WHEREFORE, Kaufman demands compensation in the amount of $7,500,000 for having been fraudulently induced to employment with Thor, and for the resulting loss of business and employment opportunities. Kaufman further demands punitive damages under New York law in an amount to be determined by the jury, or attorneys fees under Connecticut law.

**COUNT II:  Breach of Contract (Jury Trial Demanded)**

67) The allegations in ¶¶1-66 are repeated and realleged.

68) Thor drafted the Agreement and the Separation.

69) Thor offered the guaranteed bonus because it wanted Kaufman, with her decades of experience and contacts in life sciences real estate, to have the minimum compensation assurances during the first year that she insisted be part of any agreement.

70) Thor offered those assurances because Kaufman was concerned about the discretion that Thor otherwise reserved for bonuses in subsequent years, and because the likelihood of availability of Promote in the first year was low.

71) Kaufman was not terminated for cause.

72) The guaranteed bonus of $400,000 was due to Kaufman after termination – without conditions -- under ¶6(b) of the Agreement drafted by Thor.

73) Thor's termination of the Agreement was less than 30 days before the expiration date of the amendment then in effect, and less than 30 days before the December 31 payment date assured by Gliatta.

74) The Separation drafted by Thor provided in ¶5, that "…any bonuses…due at a later date shall be provided in accordance with the Employer's standard procedures and applicable benefit plan documents."

75) Thor had no procedures or plan documents that would deny benefits, including bonuses, due under the Agreement and Separation.

76) ¶11 of the Separation drafted by Thor provided that: "It is understood and agreed that those covenants which survive termination under employee's Employment Agreement with Thor Equities LLC dated June 11, 2021 shall continue to survive as provided for thereunder."

77) §6 of the Agreement governed termination. It required 30 days' notice of termination (¶6a) and that upon termination all bonuses would be paid. *Id.* ¶6(b).

78) Thor similarly threatened to terminate other executives in order to avoid paying its contractual commitments. Such deception and "retrading" was a pattern and practice of Thor and part of the management culture established by Sitt and Gliatta.

79) Thor has never paid the guaranteed bonus.

WHEREFORE, Kaufman demands payment of her $400,000 bonus, with interest, for breach of the Agreement.

### COUNT III:  Breach of Covenant of Good Faith and Fair Dealing (jury trial demanded)

80) The allegations in ¶¶1-79 are repeated and realleged.

81) Agreements made in both New York and Connecticut are subject to an implied covenant of good faith and fair dealing.

82) Thor drafted a detailed employment Agreement that assured Kaufman that (a) she would receive 30 days' notice of termination, (b) she would receive a guaranteed first year bonus of $400,000 and (c) that the bonus would be paid in the event of termination without cause.

83) Kaufman was terminated without cause.

84) She was terminated less than 30 days before expiration of the then-current amendment to the Agreement.

85) She was not paid her bonus.

86) The termination was in bad faith as her work had been exemplary and the termination was timed solely to attempt to avoid honoring the commitment to the $400,000 bonus.

87) Kaufman later learned that the practice of bad faith terminations to avoid payment commitments, and/or retrading on agreements made, was used by Sitt and Gliatta with other executives, particularly in certain foreign offices where employees had less legal recourse. Those practices were also used to "retrade" on commitments made to architects, engineers, consultants and even tenants.

88) The Kaufman termination was undertaken for the purpose of attempting to deprive her of her bonus.

WHEREFORE, in the alternative to Counts I-III, Kaufman demands payment of $400,000 for the bonus of which she was unfairly deprived, and $7,500,000 for breach of the covenant of good faith and fair dealing that resulted in lost employment opportunities at market

rates, if that amount is not awarded under another Count. Kaufman also requests punitive damages under New York law in an amount to be determined by the Court.

**COUNT IV:  Fraudulent Inducement of the Separation (Jury Trial demanded)**

89) The allegations in ¶¶1-88 are realleged.

*90)* When Gliatta presented the Separation to Kaufman on December 5, 2022, *it assured Kaufman that it would not take away her rights under the Agreement.*

91) At the time she presented the Separation document and in the previous months during which dual amendments to the payment date were made, Gliatta and Sitt knew that they did not intend to honor the bonus provision of the Agreement, as was her right under Agreement ¶6(b), and referenced in the Separation.

92) Neither Gliatta nor Sitt disclosed that intent to Kaufman their plan to renege.

93) On December 5, 2022, Gliatta and Sitt had no intention to pay the guaranteed bonus, and neglected to give 30 days notice in order to carry out that intention.

94) Gliatta knew, but failed to tell Kaufman, that her purpose in terminating Kaufman was to deprive her of her bonus, and that that had been hers and Sitt's plan since at least June.

95) Gliatta knew, but failed to tell Kaufman, that the purpose of her prior extensions in June and August were to buy time to see if Thor could find equity to remain in life sciences, and at the same time deprive Kaufman of her bonus through a termination before it was due.

WHEREFORE, Kaufman demands that the Separation be declared null and void and that any releases therein be invalidated and declared invalid.

> LAURA KAUFMAN, Plaintiff
>
> By:
>
> KAUFMAN PLLC

  /s/ Alan H. Kaufman

Alan H. Kaufman, Esq.
Bar No. ct 29258

KAUFMAN, PLLC
200 Park Avenue, 17th Floor
New York, NY 10167
Tel: (212) 257-0900
Fax: (212) 897-2370
akaufman2@kaufmanllc.net

888 16th Street NW, Suite 800
Washington, D.C. 20006