**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LAURA KAUFMAN | |
| Plaintiff, | |
| -against- | Civil Action No.: 2:25-cv-2001 |
| MELISSA GLIATTA<br>JOSEPH J. SITT and<br>THOR EQUITIES LLC | |
| Defendants | |

---

**PLAINTIFF'S CROSS-MOTION FOR PARTIAL**
**SUMMARY JUDGMENT AND OPPOSITION TO**
**MOTION TO DISMISS**

---

Plaintiff Laura Kaufman moves that summary judgment be entered in her favor under

Count II of her Complaint. ECF 7.[1] Because her arguments for judgment are the inverse of the

claims in the Motion to Dismiss, the SJ Motion is, for the most part, also Kaufman's opposition

to the pending Motion to Dismiss ("MTD" or "Motion"). ECF 29-30. To the extent that the latter

relies on the so-called Separation Agreement, that issue is addressed separately below.

### I.     Background and Material Facts

35 years ago, New York real estate mogul Leona Helmsley, on trial for tax evasion, was

---

[1]   Although Kaufman did not file a separate Pre-Motion Conference request under the Court's
Individual Practices ¶2(E), Kaufman's counsel indicated during the hearing on the defendant's
contemplated Motion to Dismiss that she would be filing a Cross-Motion for Summary
Judgment. Regardless, by submitting her Affidavit, the Court is authorized to enter summary
judgment of its own accord. Fed. R. Civ. P. 56(f)(3) when the facts not in material dispute so
allow.

quoted as having said "only the little people pay taxes." Adapted to this case, the Thor defendants believe that "only the little people have to honor contracts."

On June 11, 2021 Kaufman entered into an Employment Agreement ("Agreement") with defendant Thor Equities LLC ("Thor"). Complaint Exh. A, as amended by written agreements dated June 28, 2022 and August 29, 2022, set the payment date for her guaranteed bonus at December 31, 2022.  Exh. C. She did so after having been approached by Thor to develop and build out a life science real estate vertical.[2] Kaufman Aff. ¶, Exh. B. At the time, Kaufman had decades of experience in life sciences real estate, having begun with Lyme Properties, a pioneer in the field. Kaufman Aff. ¶. Most recently, Kaufman had been vice president at BioMed Realty Trust, one of the world's leading developers of life sciences real estate. Kaufman Aff. ¶. At BioMed, which became and remains a Blackstone portfolio company, Kaufman managed and developed one of BioMed's largest properties and was in charge of the New York region. Kaufman Aff ¶. She eliminated her own position when she successfully negotiated the sale of BioMed's premier property in New York to Regeneron for $750 million. Kaufman Aff. ¶.

### A.  The Lure

At the time that she was approached by Thor, the life sciences real estate field was in a major growth spurt caused by the influx of venture capital into biosciences during the pandemic. Kaufman Aff. ¶. When Thor approached her, Kaufman was already in discussions with several companies ,but was enticed by Thor because of its convenient location to her Connecticut residence and, most significantly, because defendant Gliatta dangled the expected $500,000,000 funding for the life sciences vertical from PFA, a Danish Pension fund. That was of premier

---

[2]   At the time Thor had less than a handful of life sciences properties and had developed none. It had acquired them under, Kaufman later determined, questionable underwriting due to Thor's inexperience. Kaufman Aff. ¶.

importance because the Agreement provided "Promote" compensation that could reach several million dollars a year,[3] competitive with other opportunities at the time. See Agreement ¶4(c); Kaufman Aff. ¶. As Gliatta put it in one of their multiple conversations as to the investments that Thor could make in life science real estate, "the sky is the limit".

Because promote compensation only occurs over time, Thor offered a guaranteed first year bonus of $400,000, so that Kaufman's first year compensation would be a minimum of $800,000. Kaufman Aff. ¶; Agreement. ¶4(a)-(b). Without that assurance, Kaufman would never have agreed to work at Thor. Kaufman Aff. ¶. The base+ guaranteed bonus was a pivotal element of Kaufman's agreement to begin at Thor, with Promote to follow.

### B.  The Thor Reality

Upon arriving at Thor, one of Kaufman's first tasks was to assess and find tenants for a Thor-acquired property at 95 Greene Street in Jersey City. Kaufman quickly determined that the property had been incorrectly underwritten. Thor had failed to adequately underwrite the market demand, incorporate the necessary costs to adapt the property for laboratory uses, and to incorporate alternative office uses in the financial base case used to attract investors. Kaufman Aff. ¶. Kaufman was hired precisely to avoid such costly errors in the future.

Thor's experience until that time was primarily in office, retail and hotels, many of which were not performing well and some of which were in foreclosure causing major investor losses. In contrast, life sciences real estate, when properly underwritten, financed, and developed, could be more lucrative than any of the asset classes in which Thor was invested. Life science real estate is a unique type of development. Unlike office, retail and hotels, life science tenants have

---

[3]   The industry standard for compensation includes base pay, a bonus (typically double the base) and "promote," intended over time to be a multiple of the base+ bonus. "Promote" is based on the company share of the profits when an investment property is sold.

requirements and needs that are specific to the type of research or manufacturing in which they are engaged. Underwriting requires specific knowledge of biosciences and pharmaceutical companies, their stages of development, their financing, and their overall needs. Kaufman Aff. ¶. Kaufman's background was therefore a major asset to Thor.

### C.  The Misrepresentations

But Thor was not what defendants Gliatta and Sitt described during Kaufman's recruitment, nor what it – to this day – claims to be.[4] First, Thor did *not* have either programmatic *or* general investment[5] from PFA. Second, Thor itself either did not have, or refused to risk, investment capital. Sitt, a self-styled billionaire, would only risk other people's money. That meant that Kaufman could not perform the tasks delegated to her, see Employment Agmt. ¶3,[6] as she would first have to source a potential project and then, largely on her own, find

---

[4]    As of the date of this filing, even Thor's website makes material false statements about its life sciences position, claiming a *current* portfolio, major portions of which are not life sciences or that were sold: Cupertino CA, San Jose CA, Berkeley CA, Research Triangle NC, Boston MA and Redwood CA. Those comprise over 350,000 sq. ft. of phantom properties. *See* https://thorequities.com/portfolio/?types=life-science.

Further, Thor claims that "Thor's life science and technology division has grown rapidly exceeding one million square feet with properties in key research markets globally." That is also false. The lion's share of its portfolio is Center for Excellence in New Jersey, at 783,500 sq. ft., but that property was bought (not developed) even before Kaufman joined the company. So of the claimed 1,000,000 sq. ft, nearly all of it is that single project from more than 5 years ago (with over 350,000 sq. ft. falely listed), hardly "rapid" growth.

[5]    Investors generally support either a program – a plan for investments of a certain type that the investor will review and/or approve on a case-by-case basis, or a dedicated investment plan, e.g. life sciences.

[6]    "responsible for overseeing all aspects of the Company's and the Company's Affiliates' (as defined below) life science-related businesses, including deal sourcing, asset management, development and leasing." Capital raising was not mentioned and had never been part of discussion of Kaufman's duties, but much of her time was nevertheless consumed by seeking capital, with little help from Thor, which had serious issues finding competent capital markets staffing.

equity and debt financing for it. That compromised her ability to source projects, as sellers typically require proof of funds from a bidder. Kaufman Aff. ¶. Despite all of that, Kaufman sourced over $2,000,000,000 in viable projects during her 17 months with Thor. Kaufman Aff. ¶. But Thor could not close, and Sitt would not invest Thor's capital.

As a glaring example of the dilemma, Kaufman's efforts to acquire $450,000,000 of profitably performing assets from her former employer, BioMed, failed when, in a comedy of errors, Sitt bobbed, weaved and dissembled when BioMed, in a qualifying conference call, sought proof of financing. To save face, Sitt instructed Kaufman to make an intentional, embarrassing lowball bid. Kaufman Aff. ¶, because Thor didn't have the funds it claimed to have in Sitt's qualification conference call.

Time after time, each of the dozen projects Kaufman sourced, -- $2 billion worth -- failed because of a lack of investment capital. Kaufman Aff. ¶. As evidence of their financial attractiveness, nearly all of those projects found buyers. This was particularly concerning for Kaufman because, among the many misrepresentations made by Gliatta, she claimed that Thor had excellent relations with capital and could raise capital for any project.[7] As Kaufman learned, that was false.

Another problem was the lack of people to assist in seeking the financing. Thor itself was leanly structured.[8] Eventually, Sitt tasked capital-raising to his personal assistant, Andreas

---

[7]  The falsity of that claim was underscored when Kaufman met with an executive at a major real estate investor and was told that they would never again participate in a project with Sitt and Thor because of Thor having to foreclose on $130 million of its projects. Kaufman Aff. ¶.

[8]  A particularly bizarre feature of the company was that, unlike any other serious company website, it featured only Gliatta and Sitt as its "team." https://thorequities.com/about/

Vlahakis, who had just moved from Los Angeles six months before Kaufman and had no contacts in New York capital markets. The result was that Kaufman had, in addition to the tasks for which she was hired, fundraising responsibility.

### D.  The Termination

At Thor's behest, there were several extensions of the Agreement and, more particularly, the guaranteed bonus payment date. Then, on 30 minutes' notice, Thor told Kaufman on December 5, 2022 that it wished to terminate the Agreement. At the time, the operative extension's bonus payment date was set at December 31, 2022.[9]

Under the 30 day Notice provision drafted by Thor, Agreement ¶6(a), the termination effective date was January 4, 2023. The Agreement, as amended by the Gliatta email dated August 29, 2022, Exh. C, set the "Payment Date of the Guaranteed Bonus as December 31, 2022," The guaranteed bonus was therefore due on December 31, 2022.

### II.    Governing Law

The law defining when summary judgment is warranted is well established. "Summary judgment may enter when there is no genuine dispute as to material fact and the movant is entitled to judgment as a matter of law." *Shiotani* v. *Walters*, 555 F. App'x 90, 91 (2d Cir. 2014) (summary order).

Not every factual dispute negates such judgment: only genuine, material disputes. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

---

[9]   The Agreement set the bonus payment date "within 15 days after" the 12 month anniversary of the "Start Date." Exh. A 4(b). The latter term, though Thor capitalized it in the drafting, was not defined – typical of the many drafting errors in the document. The actual start date was June 14, 2021. The Agreement execution date was June 11.

judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis supplied).

The substantive law (in this case, that of New York, Agreement ¶22) identifies what is

material. "Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Id.*

### A.  Law Governing Interpretation of Contracts: Ambiguities Interpreted Against Thor, Which Drafted the Contract

Because Thor drafted the contract, using attorney Nick Rubino at its corporate counsel

firm of Wachtell Missry,[10] Kaufman Aff. ¶, all ambiguities or conflicting language must be

interpreted in favor of Kaufman. *Natt* v. *White Sands Condominium*, 2012 NY Slip Op 3421, 95

A.D.3d 848, 849, 943 N.Y.S.2d 231 (App. Div.) (2nd dept) ("a contract which is internally

inconsistent in material respects or that reasonably lends itself to

two conflicting interpretations is subject to the rule invoking strict construction of the contract in

the light most favorable to the nondrafting party"); Restatement, Law of Contracts 2nd ("In

choosing among the reasonable meanings of a promise or agreement or a term thereof, that

meaning is generally preferred which operates against the party who supplies the words or from

whom a writing otherwise proceeds").

### B.  Contract Must Be Interpreted as a Whole to Achieve Its Purpose, With No Clause Given a Meaningless Interpretation

Only two modifications were made to the Rubino draft. First, that the bonus was to be

**guaranteed** ("The year 1 $400K bonus is to be guaranteed.  We can agree to a carve-out for

termination for "Cause", but otherwise it is due and payable."). Exh. D Email, Kaufman to

Rubino, April 2, 2021, ¶2. And second, Kaufman was to be paid a severance of 90 days

---

[10]  Mr. Rubino is no longer with the firm.

compensation. The bonus guarantee was integrated into ¶¶4(b) and 6(b)(3), and the 90 days severance into ¶6(b)(2).[11] Both of the latter clauses were agreed to by Thor through an email from Rubino on June 4, 2021. Kaufman Aff. ¶.

As a result, it is clear that Kaufman insisted upon severance compensation and that her first year bonus be guaranteed. Thor accepted those modifications in the Agreement and they reflect the parties' intent. *Natixis Real Estate Capital Trust 2007-HE2* v. *Natixis Real Estate Holdings, LLC*, 2017 NY Slip Op 01796, 149 A.D.3d 127, 133-34, 50 N.Y.S.3d 13 (App. Div.) (1st dept) (""[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms … The agreement must be "read as a whole to determine its purpose and intent") (citations omitted).

As we show below, Thor pins its hopes on an interpretation of its Separation Agreement ("Separation" or "SA") that would require the Court to favor one clause over another seemingly contradictory provision. But because Thor drafted the Separation in its entirety, any conflict or ambiguity is resolved against it. *Lalewicz* v. *WarnerMedia Direct, LLC*, Docket No. 24-CV-6173 (JMF), 2025 U.S. Dist. LEXIS 125918, at *13 (S.D.N.Y. July 2, 2025) ("[The] principle — known as *contra proferentum* — has particular force when it comes to a contract of adhesion (that is, a standard-form contract drafted and offered by the party with superior bargaining power").

### III.    Thor Guaranteed a $400,000 First Year Bonus to Kaufman

"[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (*Greenfield v Philles Records*, 98 NY2d 562, 569, 780 NE2d 166, 750 NYS2d 565 (2002). In this case, the guaranteed bonus could not be

---

[11]   Both clauses figure prominently into Thor's dismissal motion and discussed below.

clearer: "The Company shall pay the Executive a performance bonus covering the period of the Start Date through the twelve (12) month anniversary of the Start Date,[12] of no less than $400,000.00 (the "Guaranteed First Year Bonus"), payable within fifteen (15) (sic) days after such date, and provided that the Executive is "Actively Employed" by the Company on such payment date." Agreement ¶4(b).

Thor also placed a Notice provision into the Agreement: "Either Party may terminate this Agreement and Executive's **employment**[13] any time by giving thirty (30) days' written notice to the other Party." Agreement ¶6(a) (emphasis added). Because Notice was given on December 5, 2022, the effective **employment** termination date is January 4, 2023. The guaranteed bonus [14] due on December 31, 2022 is, therefore, within the period in which Kaufman was still employed.

But for Thor's language gyrations in its Motion, the obligation to pay the bonus is clear.

Thor's Agreement also stipulated that "Upon the Executive's termination of employment, all rights and obligations of the Company and Executive under this Agreement shall cease, except that Sections 6, 7, 8, 9, 10, 11, 12, 13, 16, 17, 18, 21 and 22 shall survive any termination of this Agreement or cessation of Executive's employment hereunder for the periods stated therein." ¶6(b) provided that "*any unpaid Guaranteed First Year Bonus due under Section 4(b)*"

---

[12]  Consistent with Thor's confusing drafting, the Agreement does not define "Start Date." The actual start date was June 14, 2021.

[13]  That Kaufman's "employment" could only be terminated upon such Notice . It warrants boldfaced emphasis because the word plays a key part in Thor's effort to dance around the "Actively Employed" language.

[14]  At the pre-hearing conference Thor's counsel claimed that the caption of ¶4 ("Discretionary Performance Bonus") superseded the content of the clause calling for the guaranteed bonus. That claim is contradicted by the exact language of Thor's Agreement ¶20 ("Captions. Captions herein have been inserted solely for convenience of reference and in no way define, limit or describe the scope or substance of any provision of this Agreement").

would be paid upon termination for "any reason other than" cause or resignation. Kaufman was not terminated for cause, and she did not resign. Thor also pretends that this language either did not exist, or that it had no meaning, or that, perhaps, it means something other than what it says..

Despite these unambiguous commitments, Thor never made the payment, which is the source of Complaint Count II. As a matter of interpretation of the basic language of the agreement, Kaufman is therefore entitled to summary judgment. *Greenfield v Philles Records, 98 NY2d 562, 569, 780 N.E.2d 166, 750 N.Y.S.2d 565 [2002]) (. Dept.)* ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms").

Thor's argument that Kaufman was not "Actively Employed on the payment date is a charade. Thor evades the language it wrote stating that only after expiration of the 30 day Notice could Kaufman's **employment** end. Agreement ¶4(a). At best, the Separation was that Notice. To interpret it otherwise is to contradict Thor's clearly written Notice obligation.

### IV. The 30 Days Notice Provision Guaranteed Payment and Could Not Be Used To Deprive Kaufman of Her Guaranteed Bonus

To paraphrase the popular Netflix TV program,[15] "30 minutes is *not* the new 30 days." The Agreement explicitly states that "Either Party may terminate this Agreement and Executive's **employment** any time by giving thirty (30) days' written notice to the other Party." Agreement ¶6(a). There was no ambiguity in the language. Thor could not terminate Kaufman's employment on 30 minutes' notice any more than Kaufman could unilaterally quit her job and walk out the same day. The Agreement is unambiguous in stating that employment could not end until expiration of the 30 day Notice. ¶4(b)..

---

[15]  "Orange is the New Black."

The obvious intent of Thor, in retrospect, was to cheat Kaufman. Thor decided it did not want to pay the $400,000 bonus that was a primary factor in her willingness to accept Thor's employment offer. Kaufman was not terminated for cause or, as Thor's counsel insists on falsely repeating, for performance.[16] She was terminated because Thor was having problems financing Kaufman's more than $2 billion of sourced projects due to its reputational issues arising from large, repeated foreclosures. The Guaranteed Bonus was due and payable because Kaufman was employed[17] at all times prior to the expiration of the 30 day Notice.

The courts have treated Notice periods with clarity: they must be honored. "If the employer has the unconditional right to terminate the contract of employment after a certain notice, *discharge has the effect of notice* to terminate and damages are allowed … up to the time the contract would have terminated if notice had been given. *Bitterman* v. *Gluck*, 256 A.D. 336, 337, 9 N.Y.S.2d 1007 (App. Div. 1939) (1st Dept.).

In *Hausrath Landscape Maintenance, Inc.* v. *Caravan Facilities Management, LLC*, 2023 NY Slip Op 04289, 219 A.D.3d 1164, 1165, 194 N.Y.S.3d 663 (App. Div.) (4th Dept.) the employer attempted a ruse similar to Thor. Under a contract with a 30 day notice provision requiring notice by registered mail, the employer instead gave 2 days notice, by email. The court accepted the date of the email as notice, but made clear that it the termination would be effective

---

[16]   As part of a transparent smear, Thor's counsel has repeatedly made "performance" claims, knowing that they are false. He provides no basis for the assertion. Apart from that, it is immaterial. Kaufman was not terminated for cause, which was the only way Thor could evade the bonus obligation.

[17]   It is common that employers decide to have the terminated employee leave the office during the Notice period. All that Thor's own definition of "Actively Employed" required was that Kaufman be "employed by the company and in good standing." Agreement ¶4(b). By definition, if ¶4(a) says that **employment** could only be terminated after the 30 day Notice had run, Kaufman was "employed" during that period. If that confuses Thor, it is not for the Court to come to its aid and reword the contract .

*upon expiration of the 30th day*, not the 2 days contained in the email: "Defendant, however, failed to provide the requisite 30 days' prior written notice of termination and instead provided 2 days' prior written notice. We conclude that defendant provided notice of termination as of September 28, 2018 [date of the email] even though that notice was not sent by registered mail with return receipt requested As a result, the effective date of termination was October 28, 2018, not October 1, 2018, and plaintiff is entitled to damages under the agreement accruing prior to the effective date." *Hausrath*, *Id.* at 1165. Applying *Hausrath,* the so-called Separation can only be interpreted as the 30 day Notice. TO do otherwise is to negate the clear Notice provision that Thor drafted.

The same principle – honoring a Notice provision – was applied in *Laurilliard* v. *McNamee Lochner, P.C.*, 2023 NY Slip Op 50671(U), ¶ 3, 79 Misc. 3d 1220(A), 190 N.Y.S.3d 920 (Sup.) ("a termination in contravention of the notice requirement does not affect the validity of the termination, *but it does leave the employer answerable for damages* "up to the time the contract would have terminated if notice had been given") (emphasis added); *McAllister* v. *Wayside Out-Reach Development, Inc.*, 2025 NY Slip Op 04565, 241 A.D.3d 539, 240 N.Y.S.3d 738 (App. Div.) (2nd Dept.) ("Where a contract provides for termination upon notice, and a termination notice is sent prematurely, the contract will be deemed to be terminated as of the first proper termination date under its provisions. The *non-breaching party is entitled to payments accruing before the proper termination date*") (citations omitted) (emphasis added).

Thor's belief that Kaufman's termination took instant effect on December 5, 2021 was therefore invalid.[18] As the Agreement stated, Thor could "**terminate** Executive's **employment**

---

[18] Remarkably – and in consummate cynicism – Thor claims that it had the right to "immediately cease" Kaufman's at-will employment. MTD at 4. But the terms of the at-will employment were further defined, and proscribed, by the Agreement Thor wrote, which stated

**by giving 30 days' Notice**." Exh. A ¶6(a). *See Morozov v. US Health Management Inc.,* 2024 NY Slip Op 33026(U), ¶¶ 6-7 (Sup.) ("If the employer has the unconditional right to terminate the contract of employment after certain notice, discharge has the effect of notice to terminate and damages are allowed … up to the time the contract would have terminated if notice had been given") (citing *Bitterman, supra*); *Guasteferro* v. *Family Health Network*, 203 A.D.2d 905, 905, 612 N.Y.S.2d 720 (App. Div. 1994) (4th Dept.) ("[the] Supreme Court properly determined that plaintiff was entitled to compensation from the time that notice of termination was properly given under the employment agreement between plaintiff and FHN and the expiration of that notice period. Where the terms of a contract are unambiguous, the court must enforce the language as written and not "make a new contract for the parties under the guise of interpreting the writing [citations omitted]"; *McAllister* v. *Wayside Out-Reach Development, Inc.*, 2025 NY Slip Op 04565, 241 A.D.3d 539, 540, 240 N.Y.S.3d 738 (App. Div.) (2nd Dept.) ("Where a contract provides for termination upon notice, and a termination notice is sent prematurely, the contract will be deemed to be terminated as of the first proper termination date under its provisions").

In their dismissal motion, the Thor defendants claim that the bonus was not vested. MTD at 19 n.6, 20.[19] But that is false. As the Agreement Thor drafted makes clear, the 30 days' Notice

---

clearly that **employment c**ould only cease after 30 days. All the at-will principle gave Thor was the right to terminate under the terms and conditions it wrote. If Thor wished to retain the right to terminate on-the-spot, it would have written that into the Agreement. That it now regrets its error does not morph into the right to dodge its own drafted language. The error is between Thor and its legal counsel. It is not for Kaufman to pay the price.

[19]    Thor achieves that peculiar result through a twisted syllogism: "since we made Kaufman's date of notice into her last day, she was not "Actively Employed" and therefore 30 minutes' notice was all we needed to void bonus payment." But Thor is hoisted on its own proverbial petard, because it wrote the 30 days' language and made that notice a condition precedent to termination of employment. It cannot rewrite language on the fly.

is a *precondition* to termination of "Executive's employment," not a termination itself. To accept Thor's contorted logic, the 30 days could be reset to a single day at its whim. That would require the Court to impermissibly rewrite the Agreement. If the Court cannot do so, neither can Thor.

**V.    The Separation Agreement Is Invalid due to Overreaching, Failure to Adhere to the Agreement's Notice Requirement and Besides, Thor Affirmed tin the Separation Document that the Agreement Covenants Would be Honored**

Thor has moved to dismiss in reliance on a unilaterally imposed Separation Agreement.[20] Exh. F. But the Agreement did not permit the instant, unilateral imposition of the SA. All the Agreement allowed was a 30 day Notice. At best, the SA constituted that Notice.

When dismissal is argued, "[a] court must accept as true the facts as alleged in the complaint and submissions in opposition to the motion, accord the plaintiff *the benefit of every possible favorable inference*, and determine only whether the facts as alleged fit within *any* cognizable legal theory." *See Leon v Martinez*, 84 NY2d 83, 87-88, 638 NE2d 511, 614 NYS2d 972 [1994]) (emphasis added).

**A.  Both the Agreement and the SA Assured Payment of the Bonus**

The SA was meant to be an ambush, but Thor's drafting errors backfire.

Kaufman did not waive her rights to the Guaranteed Bonus by signing the SA. She signed it *precisely because* it assured the bonus payment. The Agreement, ¶13(a) states that "…no term of this Agreement may be waived except by a writing signed by the Party waiving the **benefit of such term**." (emphasis added). That protection was further accorded by Agreement ¶6(e): "Upon the Executive's termination of employment, all rights and obligations of the Company and Executive under this Agreement shall cease, except that **Sections 6**, 7, 8, 9, 10, 11, 12, 13, 16,

---

[20]    The MTD meanders through a long litany of asserted facts. But it does not reference the source nor attach any documents to support them.

17, 18, 21 and 22 **shall survive any termination** of this Agreement or cessation of Executive's employment hereunder for the periods stated therein." (emphasis added). Agreement ¶6(b)(3) assured that the bonus would be paid.

Even the SA recognized that Thor's bonus obligation would not be erased. In SA ¶5 (second paragraph) it states that "Employee acknowledged that any other compensation, wages, *bonuses*, commissions, and/or vested benefits *due at a later date shall be provided* in accordance with Employer's standard procedures an applicable benefit plan documents."[21] And SA¶11 is even more explicit, specifically referring to the Guaranteed Bonus obligation: "it is understood and agreed that **those covenants which survive termination under employee's Employment Agreement with Thor Equities LLC dated June 11, 2021, shall continue to survive as provided for thereunder**." (emphasis added).[22] As Agreement ¶6(e), supra, makes clear, Section 6, which includes the Guaranteed Bonus payment assurance in ¶6(b)(3), is one of those covenants.[23]

Remarkably, and as if embarrassed to make the argument in easily readable form, Thor makes a critical argument in a 10 point footnote. Thor argues that SA ¶11 *precludes* the bonus

---

[21]  The Thor Employee Handbook has no provisions impacting the payment of bonuses.

[22]   Thor relies on a recitation in the SA to the seeming effect that the consideration (more on that below in Argument V(C)) was all the compensation to which Kaufman was entitled. But any conflict in terms or confusion in drafting are resolved against Thor because it drafted the SA. *See Natt* v. *White Sands Condominium*, 2012 NY Slip Op 3421, 95 A.D.3d 848, 849, 943 N.Y.S.2d 231 (App. Div.) (2nd dept) ("**a contract which is internally inconsistent in material respects or that reasonably lends itself to two conflicting interpretations is subject to the rule invoking strict construction of the contract in the light most favorable to the nondrafting party**") (emphasis added) and other cases cited in Argument II(A-B), *supra.*

[23]   Thor argues that other language in the SA means that Kaufman walked away from future compensation. MTD at 11-12. But Thor fails to explain how that argument can be reconciled with other language in the SA assuring Kaufman of what was due in the future. The latter assurances encompassed payment of the bonus on December 31, 2022.

because "the bonus section, Section 4, was not identified as one of the surviving sections." MTD at 6 n. 3. That central fallacy, while cute, is specious. The SA ¶11 specifically references "the covenants which survive termination." Agreement ¶6 is one of those. See Agreement ¶6(e).

¶6(b)(3) expressly states that "a**ny unpaid Guaranteed First Year Bonus due under Section 4(b)** would be paid upon termination." Agreement ¶6(b)(3) is therefore incorporated by specific reference into the explicit promises in the SA, which is why Kaufman was willing to sign it. Kaufman Aff. ¶.

But Thor does not stop there. After arguing that Agreement ¶6 does not reference a bonus, it then says well, true, there is specific reference to the bonus under ¶4(b), but only "if it is due." Then, in a tautological masterclass, Thor posits the use of circular reasoning: since we terminated Kaufman on 30 minute notice, the contract requiring 30 days notice gave Thor the option of immediate termination. Which, Thor continues, means that "no bonus was due."

If this appears to be a bit confusing, it's because it is. That is the way Thor drafted the Agreement. But interpreting any confusion against Thor, as the law requires, means that the bonus *was "*due." That is the case because even ¶6(a)(b) – the linchpin of Thor's hopes, expressly qualifies the "immediate" cessation of employment "**except as expressly provided for below**."

What is "expressly provided for below"? ¶6(b)(3), which promises that upon termination "any unpaid Guaranteed First Year Bonus due under Section 4(b)" will be paid, is what ¶6(a)(b) points to. And the amended Agreement expressly provided that it would be paid on December 31, 2022. Exh. C. A promise that something will be paid means that "it is due" on the promised date.

**B. Kaufman Did Not Agree to Waive Her Right to 30 Days' Notice**

Thor's word game takes a 30 day Notice provision and converts it into a right to immediate termination ("upon a termination notice by either party, plaintiff's employment could last anywhere between zero and thirty days, at the Company's discretion," MTD at 3). But even then, the SA affirms the surviving covenants, including the obligation to pay the bonus. SA¶11, Agreement ¶6(b)(3). Thor twists the latter language into conditional language. Its verbal contortions are necessary because Thor wrote a contract it wishes it hadn't. The Notice provision Thor wrote does not allow Notice "between zero and thirty," as Thor urges. The word "zero" is nowhere to be found. "[A]ny ambiguity in the contract is to be strictly construed against the drafter of such language." *Cambridge Construction Corp.* v. *Bfc Construction Corp.*, 191 Misc. 2d 25, 26, 738 N.Y.S.2d 150 (App. Term 2001) (1st Dpt.).

On December 5, 2021 Gliatta called Kaufman to a conference room, handed her the SA, said that Thor no longer wanted to be in the life sciences space, and that was it. Kaufman Aff. ¶. As a matter of law, applying the language of the Agreement, the SA could serve as no more than a de facto 30 day Notice under Agreement ¶6(a). Kaufman had not agreed to waive her right to that notice. *That's What She Said, Inc. v. Gutter Games Ltd.,* No. 22 CIV. 4230, 2024 U.S. Dist. LEXIS 138014, 2024 WL 3678473, at *12 (S.D.N.Y. Aug. 5, 2024) ("Under New York law, '[c]ontractual rights may be waived [only] if they are knowingly, voluntarily and intentionally abandoned"); *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 104, 850 N.E.2d 653, 817 N.Y.S.2d 606 (2006) (same). Merely signing the SA did not constitute a waiver. Kaufman did not sign a release saying she relinquished her right to 30 days' Notice. Besides, SA §11 specifically promised to honor whatever was due under the termination

covenants in Agreement ¶6. At best, the SA may be construed as the 30 day Notice, as the courts have done repeatedly when a party terminates an agreement in a muddling fashion.[24]

The notion that Kaufman could be terminated with zero notice is a self-serving delusion. It contradicts all law regarding contract interpretation. It converts the specific Notice requirement into nonsense language, which is impermissible. The Notice requirement to terminate employment is specific. It cannot be made subservient to more general language or interpretations. *Greenwich Capital Financial Products, Inc.* v. *Negrin*, 2009 NY Slip Op 51890(U), 24 Misc. 3d 1245(A), 1245A, 901 N.Y.S.2d 899 (Sup.) ("u]nder well-settled principles of contract interpretation, [e]ven if there is an inconsistency between a specific provision and a general provision of a contract … the specific provision controls").

Any modification to the Agreement must be mutual, so Thor could not, on a whim, decide that 30 minutes notice – or "zero notice" -- could substitute for 30 days. *Beacon Terminal Corp.* v. *Chemprene, Inc.*, 75 A.D.2d 350, 354, 429 N.Y.S.2d 715 (App. Div. 1980) ("Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including *mutual assent to its terms*") (emphasis added). Moreover, the Agreement itself contained language that "no term of this Agreement may be waived except by writing signed by the Party waiving the *benefit of such term*." Agreement ¶13(a) (emphasis added). Waivers could, therefore, only be valid if a specific term meant to be waived is cited. The SA was not a waiver of Notice.

---

[24]  Because release language is fact bound, Thore's reliance on boilerplate caselaw language about releases cannot undermine the specificity of the language it wrote to assure Kaufman that all of the release language was subjugated to the SA ¶11 assurance of the ongoing validity of the termination covenants in the Agreement ¶6(e). All of the release language in the Separation was conditioned on the survival of the Agreement's termination protections.

### C.  The SA Is Invalid and Unenforceable Due to Overreaching

Even though, as explained, the Separation protects Kaufman's bonus, its presence in the case muddies the issues. Voiding of the Separation is therefore an efficient way to proceed, and is warranted by the principle of overreaching.

Apart from Thor's attempt to nullify the Notice terms of its contract, its ham-fisted approach through the use of a "Separation" was unlawful in these circumstances. "[I]t is inequitable to allow a release to bar a claim where . . . it is alleged . . . that it was the result of overreaching or unfair circumstances" (*Bloss v Va'ad Harabonim of Riverdale*, 203 AD2d 36, 40, 610 NYS2d 197 [1st Dept 1994]; *see e.g.  v Braun*, 170 AD3d 506, 96 NYS3d 181 [1st Dept 2019] ("The nature of the relationship between the parties and the disparity between received and fair value of plaintiff's claim raised issue of fact as to the validity of the release").

Nullification or voiding due to overreaching is inherent in the court's equitable powers. "In the application of their equitable powers, the courts may rectify any detriment that results from a party's material change of position as the consequence of fraud, mutual mistake, incapacity, overreaching or similar grounds by restoring the parties to the status quo ante. Central considerations to the issue of overreaching are the nature of the relationship between the parties, the disparity between the consideration received and the fair value of the contract and any knowledge by the overreaching party of the incapacity of the party who sustains detriment *Skolnick* v. *Goldberg*, 297 A.D.2d 18, 20, 746 N.Y.S.2d 296 (App. Div. 2002) (1st Dept.).

### 1.  Nature of the Relationship

Having lured Kaufman out of a vibrant life sciences real estate market, and away from other suitors, with promise that the "sky is the limit" for Promote compensation, and with a guaranteed first year compensation of a minimum of $800,000, Thor was in the driver's seat.

19

Sitt, a billionaire, could impose his will on the "little people," whether they be architects he refused to pay, consultants he stiffed, Kaufman Aff. ¶, or executives like Kaufman. Thinking they could not only unilaterally eject Kaufman into a declining market for her services, Sitt and Gliatta felt that they could tear up all of the promised Agreement covenants protecting her. To them, it was "take it or leave it." The power imbalance was flagrant and transparent.

### 2. The Disparity Between the Consideration Received and the Fair Value of the Contract

Although New York law allows pre-existing obligations to serve as consideration, New York Consolidated Laws, General Obligations Law - GOB § 5-1105, that does not mean that offering past consideration as present is an escape valve from overreaching.  In this case, the only consideration offered by Thor to compensate for the (Thor hoped)[25] evasion of the bonus was a payment guaranteed in the Agreement itself. Agreement ¶6(b)(2) assured Kaufman of "Base Salary for the ninety (90) day period after the termination date." So Thor's payment of 90 days' base salary, SA ¶2(a) was not an act of "generosity," as claimed by Thor's counsel in the Pre-Motion Conference, but was in fact just paying Kaufman what they owed her anyway. And the "benefits" under SA ¶2(b) were just another obligation under the Agreement. ¶5.

As a result, the major gap between the consideration for the SA and the guaranteed bonus due under the Agreement was textbook "disparity between the consideration received and the fair value of the contract." It was classic overreaching. *Chadha* v. *Wahedna*, 2022 NY Slip Op 04089, 206 A.D.3d 523, 525, 171 N.Y.S.3d 87 (App. Div.) (1st Dept.) ("[I]t is inequitable to

---

[25]  As we argue *supra* in Argument V(A)*,* in their haste to cheat, Sitt and Gliatta tripped over their own feet. Poor drafting meant that they had to pay the Guaranteed Bonus even though they thought the SA could get them off the hook.

allow a release to bar a claim where . . . it is alleged . . . that it was the result of overreaching or unfair circumstances").

And regardless of whether Thor agrees, all it can do, at best, is raise a question of fact. *Sacchetti-Virga v. Bonilla,* 2018 NY Slip Op 01210, 158 A.D.3d 783, 784, 73 N.Y.S.3d 194 (App. Div.) (2nd Dept.) ("the plaintiff's allegations were sufficient to raise a question of fact as to whether the defendants procured the release by fraud, whether the release was signed by the plaintiff under circumstances which indicate unfairness, and whether it was "not fairly and knowingly made"); *Powell v Adler*, 128 AD3d 1039, 1041, 10 NYS3d 306 (2d Dept 2015) ("these submissions raised triable issues of fact as to whether, inter alia, there was fraud in the inducement of the release, and as to whether the release was fairly and knowingly made").

Thor's claim of an airtight, all-encompassing release is therefore misguided and contrary to law. Thor's citation to generalized law relating to releases, Motion at 10-11, does not allow it to divorce the SA from its specifics and the context in which it was signed. The cases Thor cites all turn on whether the release was valid and are fact-bound. There are few, if any, generic releases.

## VI.    Sitt and Gliatta Are Personally Liable; They Cannot Find Refuge Within the Corporate Veil

Under New York law, "[t]o state a cause of action under the doctrine of piercing the corporate veil, the "plaintiff must allege facts that, if proved, indicate that the shareholder exercised complete domination and control over the corporation [or LLC] and 'abused the privilege of doing business in the corporate [or LLC] form to perpetrate a wrong or injustice' "*Board of Managers of Beacon Tower Condominium* v. *85 Adams Street, LLC*, 2016 NY Slip Op 00692, 136 A.D.3d 680, 682, 25 N.Y.S.3d 233 (App. Div.) (2nd Dept.); *East Hampton Union*

*Free School District* v. *Sandpebble Builders, Inc.*, 2011 NY Slip Op 1319, 16 N.Y.3d 775, 919 N.Y.S.2d 496, 944 N.E.2d 1135.

Defendant Joseph Sitt owns 99% of Thor Equities LLC. Exh. E. Gliatta has been chief operating officer for over 20 years. Uniquely, and seemingly without precedent in the websites of all comparably sized[26] New York real estate companies, Thors only lists Sitt and Gliatta as its "team."[27] Sitt and Gliatta control everything done by Thor. Kaufman Aff. ¶.  They jointly exercise domination and control over the company, and in this case, "abused the privilege of doing business in the corporate [or LLC] form to perpetrate a wrong or injustice." *Beacon Tower Condominium*, *supra.* They promised a "Guaranteed Bonus," Agreement ¶4(b), promised that it would be paid on termination without cause, Agreement ¶¶6(b)(3), 6(e), and even in the SA promised that "it is understood and agreed that those covenants which survive termination under employee's Employment Agreement with Thor Equities LLC dated June 11, 2021, shall continue to survive as provided for thereunder." SA ¶11.

Having held themselves out as being the entirety of the management company, fn.24, and with Sitt owning 99% of the company, Gliatta and Sitt cannot seek Court protection through the veil of a limited liability company.

## CONCLUSION

Kaufman was lured to Thor with promises of compensation comparable to market. Because Promote compensation is based on future profit, the defendants promised Kaufman a minimum of $800,000 compensation for the first year. They did so because life sciences real estate was enjoying a heyday, and Kaufman was one of the most experienced executives in the

---

[26]    Thor claims assets under management of $20 billion. https://thorequities.com

[27]    https://thorequities.com/about/

country to allow Thor entry into the field. But when Thor proved the falsehood that it lacked

capital markets standing and they failed to finance the $2 billion in deals sourced by Kaufman,

instead of keeping its commitments, it sought an escape on the cheap. Summary judgment on the

Guaranteed Bonus is therefore warranted, and the Motion to Dismiss should be denied.

LAURA W. KAUFMAN, Plaintiff

By:

KAUFMAN PLLC

 /s/ Alan H. Kaufman

Alan H. Kaufman, Esq.
Bar No. ct 29258

KAUFMAN, PLLC
200 Park Avenue, 17th Floor
New York, NY 10167
Tel: (212) 257-0900
Fax: (212) 897-2370
akaufman2@kaufmanllc.net

888 16th Street NW, Suite 800
Washington, D.C. 20006


Certification of Service

I hereby certify that on December 5, 2025 a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.


/s/ Alan H. Kaufman_____